On behalf of the athlete, Ms. Diane Campbell. Good morning, counsel. Justice Burkett was unable to be here today. However, he will participate in the deliberations on this case and listen to the tape of the oral argument. Mr. Hildebrand? Thank you. May it please the court. My name is Jack Hildebrand and I'm representing the defendant, D'Antonio Layne, in this case. I'd like to talk about the first two issues and if there's any time left over, I'll make some comments on the sentencing issue at the end. Well, counsel, I'd actually like to talk about the sentencing issue this morning first, if that's okay with you. That'd be fine. I have a question and that is, you asked that the case be remanded for retroactive individualized determination as to whether this defendant should be transferred to adult court. But there is still good law, is there not, here in Illinois? The Supreme Court case in 1984, People v. J.S., which held that the automatic transfer provision did not violate a juvenile defendant's substantive due process or procedural due process. So how can we even think about doing that and, in essence, change the provisions in light of the state of the law in Illinois? Well, these three cases that defendants in this type of situation are relying on, the U.S. Supreme Court cases of Miller, Roper and Graham, I think change that. And under the reasoning in those cases, they're basically saying that a juvenile is different and in a substantive way. And that's what my argument is basically saying, that this would be unconstitutional for this to go ahead in the manner that it has. Because, first of all, the transfer statute doesn't take into account anything about the defendant's individualized factors. And that's what these cases say that has to be done. And so part of this sentence is automatically imposed. And then we have the add-on sentence of the firearms, which is automatically imposed, just like it would be on an adult. But now if we look at these two Supreme Court cases and then the Miller case, those cases involved capital punishment for juveniles and life sentences. Yes. This case, while it's a very long sentence, I will grant you that, does not. That's correct. So, again, how are we then to look at those cases and say that should change the J.S. case, for example, that I just referred to and the fact that we have the automatic transfer provision in this situation? Well, my argument is that he is going to get the equivalent of a life sentence. And I think that the sentence that he did get, and even the minimum sentence in this case, is sufficient enough to trigger those cases, the Miller, Roper, and Graham cases. Even if your client had been given the minimum plus the 25, that still would trigger? Yes. Because? Because? He's not going to be getting out until he's in his 60s. How does that take into account, would be my argument, how does that take into account his rehabilitative potential? So what would you suppose the sentence should be? I think it should be something that is imposed by a judge that's not restrained by these automatic impositions of first going into adult court. Well, let's assume we're in adult court. What would you propose as an appropriate sentence? And let's assume that it was done by discretionary transfer. So, I mean, Justice Jorgensen asked what do you think the sentence should be. I mean, that's another part of the sentencing issue that even apart from the Supreme Court cases you just talked about, that the sentence was too high and didn't take into account his youth and rehabilitative potential. Well, something that would give him the opportunity to get back into society before he's in his 60s at a retirement age, or in this, the sentence he did get when he's in his 90s. So where do we draw the line? Well, we'd have to look at the specifics of the case. You know, Miller said that you're not supposed to impose a life sentence without parole except in the rarest cases. I would say how is this a rare case? He didn't get a life sentence without parole. He is eligible for parole. That's correct. And my position is that- It doesn't matter because it's so many years. It's so many years that it's the equivalent, and it should trigger those protections that Miller and Graham Wilber talked about. I mean, he's not a serial killer. He's not a serial rapist. There was no evidence that he tortured people or anything like that. I am confident that you have, both of you justices, have seen many, many juvenile cases where the juvenile has been convicted of murder. And in each of those cases, and in most of those cases, there's a similar background. Acting out, violent acting out, not following the rules, doing porn, school, poor home environment. That's what's in this case. This is not an exceptional case. And he received an exceptional sentence. He's not going to get out, unless he can survive in prison until he's in his 60s, or if that was the minimum sentence. But in here, at 95, he's going to get out. I mean, that's just not a realistic chance at reentering society, and that's what we're supposed to gear our sentencing toward, to getting them back into society, because they're less culpable than adults, and they have greater potential for rehabilitation. And the sentences imposed in this case and the minimum sentence do not take that into account. But yet, you're asking that we reduce the sentence to something closer to the minimum. Yes, absolutely. I mean, if I cannot obtain relief for Mr. Lane under a non-constitutional challenge, at least. So he's now, what, 17? He was 15 when this happened. 17 or 18. The minimum is 20 and 25. It's 45. No, that would be with the add-on? Yes. His 60, isn't it? Well, he would be, you know, if he had to say John, he'd be 60. So for that, obviously, whether he would make it until he's 60 in prison, we don't know, but it's certainly a better chance than the 80 years that he received. As far as? Just one more thing on the sentencing, and then certainly we'll go back to what you wanted to talk about. You had argued, I believe, that the trial judge, I believe, had abused his discretion in giving him the lengthy sentence and hadn't taken all of the factors into account. But yet the trial judge certainly indicated he was aware of his youth, but he also mentioned a couple other factors, such as deterrence and protection of the public in pronouncing this sentence. So are you suggesting that this Court substitute its judgment and not, and somehow decide to give less weight to deterrence and protection of the public than the trial judge did in producing a sentence here? No, I'm not. No. I think that taking into account the age of the defendant is not enough. I think you have to take into account the core teachings of Miller, Roper, and Graham. And that was not done in this case. As far as the Court saying, well, you know, we need deterrence because we can't have kids running around wild in the streets with guns, isn't that, that to me is treating him as an adult. This ain't responsibility and culpability as an adult. We don't want adults running around our neighborhoods either with guns. An adult should know better not to be running around the neighborhood with guns. And your argument is that a kid does not know better, doesn't know that he shouldn't be using a gun in that manner. Absolutely. He is less culpable according to those cases, the teachings in those cases. And here it was just, you know, the Court basically found him incorrigible. And I think that's what Miller and Graham and Roper say. You can't, that's what you should avoid doing in cases like this. Because they are to be treated differently in a substantive way. Thank you. And thank you for shifting gears right at the beginning. Very nicely done. Thank you. I'd like to jump to the part about counsel being ineffective for not trying to get this hearsay statement. Right. In a case like this, I think a defendant should be given every chance he has to present evidence like this if it's really needed for his defense. And it's crucial here in this case because we have the I'll grant you that it was a very critical piece of evidence, no question. If that statement comes in, it certainly bolsters his position that this was self-defense. But if you could move to some of the factors that we have to consider and tell us why you think that even if counsel had raised that, that he might have been successful in keeping that out. I'm sorry. Letting it in. Yes. Getting it in. Well, let's start right off with the mother's testimony. She states that just shortly before the shooting, Christopher Fryer and Mississippi come over to her house. And just prior to them coming over, Mississippi was over there with a bunch of boys saying they're going to kill the defendant unless he gives the gun back. So there we have Mississippi or Fryer at the house. That is corroboration. I think we both agree that that portion is, the records replete that the certain players were at the locations. But if you could get to the heart of the statement itself. Well, and let's talk about, I mean, there was no opportunity to cross-examine him, right? No. So, I mean, that factor isn't met. No. And, I mean, the rule requires that the witness not be available. So, in most cases, you know, that's going to be the case. Right. Okay. Well. So, if we're left with close acquaintance or not. And whether it was spontaneous. Right. Yes. Well, I think, first of all, if this was just an offhand assertion by the defense. Oh, he made this comment to Sean Claude Lane. The first big hurdle would be, wait a second, why are these two even talking? Right. You know, why are they even talking? Is Sean Claude over at his house having a leisurely afternoon discussion with him or something like that? We don't have, you know, that would be a big hurdle for the defendant to get over. But here we have evidence that they were together after the incident. Yeah. They were together. They were incarcerated together. Right. They were in juvenile detention. Right. They didn't choose to be together. No, they didn't. But, fortuitously, they were together. And it can be shown that they were together, so that places him in a position to actually make the statement. But how does that make him a close acquaintance? And how does it make the statement spontaneous? Well, it seems to me that all these people were in the same neighborhood. They all knew each other. They knew each other's family. They couldn't stand each other pretty much. Pardon me? They pretty much couldn't stand each other. Right. Yes. I don't know the interplay of all these, but, like, for example, defendant's cousin went to help Fryer after Fryer was shot. So if there's battle, if there's sides to this, they're very intermingled. And we don't, can't make that conclusion. But there's nothing to suggest it wasn't spontaneously made. I mean, defense counsel asserted that. Nothing to suggest it wasn't. No. It's your burden to show it was spontaneous. Well, he said that, and he told him. And just telling him something like that would suggest that it was spontaneously made. He told him. He told him that. Okay. How about shortly after the crime occurred? Wasn't there a substantial amount of time? There was a couple months. But in this case, if we take each case on its own facts, that is when they were brought together. And because it's two months, that shouldn't disqualify this from coming in, especially because of the necessity he needed to present this. I mean, the defendant was the only one who stated he saw the gun. He's the only one. And without some kind of cooperation, he is in a bad position because, like all defendants throughout the country, a jury may very well look at him, well, he's the defendant. He has self-interest. He's the one that goes to prison if convicted. And he's the only one who saw the gun. And here he has an opportunity to present the evidence that somebody else saw the gun as well. Not saw the gun, took the gun. Saw it and took it. So I guess you have to see it to take it. So you're right. How do we weigh it? I mean, how do we weigh that against, I thought it was two witnesses. I got the names mixed up, forgive me. But two other witnesses who said that the victim here walked away with his hands up. Yes. Do we have to weigh that as well? I don't really think so because that really doesn't go to whether or not Holland saw the gun or not. And whether he took the gun later. But those girls testifying that they saw Holland with Fryer at the time of the shooting, that again, that is really supportive information because it places him there again with the opportunity to actually have seen the gun. And then we have the police officer testifying. You may finish, please. The police officer testifying that he saw Holland over at the body after Fryer went down, which again places him there, giving him the opportunity to have taken the gun. So we have three instances of him being placed in those positions. I get you. But how do we reconcile the two girls who say his hands were up with the relevance necessary? In other words, this statement coming in still has to be relevant material. If this is a self-defense and we have two witnesses say his hands were up, how could he possibly reasonably expect that he was going to be shot? Well, if we believe that his hands were up when he was shot, we don't really know that. They said he was walking away. But we have these two. My point is we have to consider all of the evidence. You can't just say, okay, this corroborates it and we'll ignore everything that doesn't corroborate or actually flies in the face of the reliability of the statement. Well, if you have statements that corroborate it, I think that weighs extremely heavy in favor of admission because it's an objective standard. Just because somebody else is saying that it doesn't, that really doesn't matter because all of these cases, the bottom line in all of these cases that I cited, the bottom line is that if it is necessary for his defense, you can't mechanically apply this rule because that would be a violation of due process, and I think that's the situation here. If we say that, no, it's not going to come because you don't have enough, that would be a mechanical application because it's necessary and there is significant corroboration. Thank you. You'll have an opportunity for rebuttal. Ms. Campbell? Good morning, Your Honors. My name is Diane Campbell. I represent the people. Would you like me to do the Irie-Holland statement first or the sentencing issue first? No, it doesn't matter as long as you address both of those. All right. I'll do the Irie-Holland statement since we just finished that. Okay. The against penal interest exception does not do away with the hearsay rule, and particularly in people versus penny, the Illinois Supreme Court said it's a very narrow exception. So you do have to look at the indicia of trustworthiness and determine if there's enough. Your Honors brought out several of those factors. The statement was made two months after the offense. It's when the two gentlemen are in juvenile detention. They are not friends or close acquaintances. They are divergent halves of feuding parties. The statement, in some cases, when they're looking at indicia of reliability, they look at who the statement was made to and if that can be used as an incriminating statement. This is made between two juveniles in the juvenile detention center. In one of the other cases, such as the Holland case, which my colleague cited in his brief, the statement is made when the, I believe it's a juvenile in that case, is accompanied by his parents, and he makes the statement in front of an assistant state's attorney and the police officers. So those are some people who could bring charges against him for that. So there is some against penal interest status there. That's not present here. He's making it to somebody else in juvenile detention who is somebody. I'm sorry. You're saying it's not against his penal interest? Well, what you have is the defendant's brother saying this guy said something that might lead to charges against him, maybe. When I mentioned that part of the reason Irene might have taken the fifth was that perhaps he brought a gun himself, defense counsel's response was that unless you have some sort of further evidence, the defendant's mere statement doesn't make him subject to criminal prosecution, and so therefore it's not against, you know, that's not a valid. So I would turn that and say, you know, here all we have is the defendant's brother, who has an obvious bias and motive for trying to clear his brother of the charges, saying that this other guy made this statement to me. So, you know, with Ivory Holland, you're trying to get an inference with the defendant's brother. You have an obviously biased person saying somebody else made an incriminating statement. There's nothing that, and I would like to go into a few of the factors concerning Ivory Holland. He was, in fact, at the scene. He had accompanied Spider up the walkway. That is the only indication of any validity of any part of what the defendant claims he said. He spoke with the officer at the scene, and the officer didn't notice that Ivory had a gun. Ivory did not mention to the officer any statement about a gun. As your honors noticed, the two sisters, Natasha and Felisa Glass, both said that the defendant did not have a gun. So all the evidence indicates that there was no gun. There's no corroborative evidence. You mean the victim did not have a gun? Sorry, yeah, sorry. Yeah, the defendant obviously had the gun, and that was recovered. That's also one of the distinguishing factors is that elusive, you know, other gun was never found. The police searched the area. They searched the gutters. They were looking for any other gun at the scene, and it was never located. Thank you. In this case, it was not really spontaneously made. The two young gentlemen are in juvenile detention. Ivory could have been seeking either to curry favor with the defendant's brother or been intimidated by him if he, in fact, actually made the statement. Do we know the circumstances under which the statement was made, whether they were at a mealtime or gym or school? There's nothing in the record about that. There's nothing. That's another thing is that defense counsel never had the brother, Sean Qual, make any sort of offer of proof regarding what, you know, he would have testified to, and that is one factor to consider. And also, I would debate certainly had that testimony gone in, it would have been helpful. But the defendant is presenting a self-defense claim, and he is in the locked house when he shoots out the window at the guy on the sidewalk. If the defendant had, he had been sitting in a chair in the room, then he goes to the window and they see Spider, the victim, coming up the walkway. Had he stayed in his chair, you know, who he probably wouldn't have seen had he gone into the bathroom, another room. You know, he could have avoided the situation. He is the one that creates the situation, creates any sort of danger that he's in that would necessitate self-defense. How does that bear on the factors of trustworthiness and reliability of the statement? I think it goes to defense counsel's argument that this is crucial and that, you know, this is the only linchpin of the self-defense. Well, it's not that, but it certainly is very helpful to a self-defense that the other guy had a gun. Still, when you're the guy in the locked house shooting out the window at somebody on the walkway. Well, we don't know that the house was locked. Yes, we do, actually. And this was August and there was a shooting through a screen, so it's not like a fortress here. There is testimony that I think it's the younger sister Felicia had locked the door. They're not going to let Spider into the house, you know, to get in a confrontational situation with the defendant. Had the defendant, you know, walked away from the window, go to the bathroom, you know, he's not visible or in danger from somebody out on the sidewalk and the guy's not getting in. But basically, there are not sufficient indicia of reliability of that. I remain that statement to Sean Quill that it should have been admitted as an exception to the hearsay rule. Do you have other questions or should I go on to the sentencing?  Okay. Certainly, in this case, there is no problem with the defendant's sentence. In the Supreme Court cases, what the courts have found to be violative of the defendant's rights are cases where the juvenile receives either a death sentence or a natural life sentence, mandatory natural life. Part of the reason for that is they say that is too harsh and that the trial judge is not being given the opportunity to exercise any sort of discretion. He is required to impose unduly harsh sentences on a defendant without consideration of the circumstances. Certainly, that is not the case here. Well, he got the equivalent of a life sentence, did he not? I don't know the statistics. Well, I don't think so. Let me explain. What the courts have found to be the problem is if it's in one chunk. They have not found aggregate sentencing to present the same problems. And I agree with that. In aggregate sentencing, you have different factors that are coming into play, adding together to create the harsher sentence. I'm sorry. Do you have case law in your brief about that? I don't recall. You can either indicate yes or no. I don't need you to take time to find it. But I, just off the bat, don't remember. I'm trying to remember. Okay. Just for your honor's interest, there is another sort of confluence of the statute's issue coming up on Thursday before this court in People v. Reyes. And I participated in the mooting for that brief, so I'm getting confused exactly what I have in my brief and what was in those briefs. But that may be helpful for your honors. Okay. But basically in this case, the defendant has earned his way up. As your honors noticed or noted, the juvenile transfer statute has been continually upheld as constitutional. That was the first confluence of the statutes that the defendant relied on. In this case, there is a 25-year add-on for the firearm. Let me ask you this. Sure. Is this an abuse of discretion? I don't think so. It's a 15-year-old kid that got five less than the maximum. Correct. But the judge made a very careful consideration. I listed some of the factors that he considered for the defendant's personal characteristics on page 27 in my brief. And in particular, the defendant has serious behavioral problems, a very severe history. There's not indications of rehabilitative potential. And that is based entirely on the defendant and his characteristics. Individually. Yes. So in that case, and I think the trial judge obviously made a very serious, considered decision when he announced that sentence. I don't think it was lightly made or imposed. The overemphasis, I think, on just the defendant and the effect on him means that you are eliminating half of the equation, which is that you also have to consider the protection of the public and the administration of justice. In this case, the trial judge clearly found that the sentence was necessary to protect the public. The defendant was eligible for a 20- to 60-year sentence on first-degree murder. The judge gave him 55. How did he take into account his youth as explained and talked about in the three Supreme Court, or two Supreme Court, in Groper and Graham and then the Illinois case of Miller? I think he did because, well, in part, if you read the sentencing hearing, the defendant's youth is continually brought up by defense counsel. Calls him a young man, you know, that sort of phrases. There is no way the judge can avoid considering the defendant's youth when he's making his determination. And I think in this case, he's considering the youth and the danger that he presents. And the fact that, you know, if he's given him a youthful sentence, the public is going to be in severe danger. So you're saying he's way back. It's considered in his calculations when he's considering, you know. There's also the fact that he's only 15, and this is the history he has already. This is a dangerous, violent young man. All the sociological things say, you know, adolescence and personality isn't really formed, you know, certainly not in adolescence and maybe not even into mid-20s. So if you let this guy out, you know, at 21, then he's a danger to the public. Well, I think there's a big difference between out at 21 and out at 91. Yeah. Well, I think the court took that into consideration. He could have given the defendant the minimum, but he didn't because he viewed him as dangerous. And I think, as you said, you know, here we have to give deference to the trial court judge who heard the evidence. He's seen the defendant's, you know, behavior in his courtroom both during the trial and in all the pretrial. There are continual episodes in the pretrial proceedings where there are reports coming back about the defendant's behavior while he's incarcerated before trial. And the judge is trying to be very encouraging to the defendant and encourage good behavior, and it's not working. As I say on page 22, there are 92 major rules and fractions. There are several fights. Before he went into the detention, you know, he's gotten in trouble in school. But isn't that very different than a long criminal history or history of juvenile adjudications for either property offenses or offenses against persons? I mean, how you act in detention, how is that reflective of what your record is on the street? Well, I think his record on the street is also, you know, very eminent. We have the ongoing feud with the other party. The whole trial is rife with incidents between these two groups. Let me ask you this. Is it basically the state's position here? And I'll then give you a couple minutes to finish your thoughts. But is it basically your position that as long as the trial court exercises its discretion, if the trial court here had given a 15-year-old kid with his criminal history the maximum, we would affirm and the touchstone is simply that the trial court exercised discretion? I think he exercised appropriate discretion. Okay. So you're saying it's appropriate here? Yes. Which is what is required. What you have to take into consideration are the circumstances of the offense and the defendant's individual characteristics. Here we have the extensive, very violent history. The circumstances surrounding the offense. There's the ongoing feud. You know, people are shooting each other in incidents all over.  The defendant and his family and Spider and his associates. The judge refers to it as the wild, wild west, you know, because everybody's got guns. You know, everybody has priors. So you're taking into consideration those circumstances. There's also the individual facts of the offense. The defendant was in the lot. Again, that goes to whether you think it's appropriate. But your touchstone is that the trial court, if it exercises discretion, that that's what makes the sentence okay. And then I suppose we sit and say, well, whether it was appropriate discretion, but that's the issue. And that's how you distinguish the Supreme Court cases that say you really have to look at these differently because it's a juvenile. And you say as long as there was individualized exercise of discretion, you have satisfied this new line of cases. Well, not quite. Okay. What you have to do is in your exercise of discretion, take into consideration those important factors, which are his youth and the circumstances of the offense. Go ahead. Finish your sentence. His youth and the circumstances of the offense. Those are the two things. What they're trying to avoid are situations such as both the Miller cases, the Illinois Miller and the U.S. Supreme Court Miller, where a defendant is given the natural life sentence for accountability. They are not taking into account his culpability, his individual culpability. In both those cases, the youth was a lookout in a situation for other people. You know, they never touched the guns. Here, the defendant touched the guns. He shot him from inside. He went out on the porch and shot three more times at him. But now when you were saying take into account his youth, yes, there may be evidence that the judge knew he was 15, but do you believe he took into account the factors that these Supreme Court cases talk about, which are that somebody who is youthful doesn't have the same judgment, the same ability to restrain themselves, has less impulse control, those factors that appellant's counsel, I believe, was referring to? I think he did, but he's also weighing it against the factors of protecting the public and administration of justice. The fact that this 15-year-old shot someone else who is also 15, you know, for the administration of justice, you know, the defendant was not, or the victim was not a particularly nice person, and there was the ongoing feud with, you know, everybody, accusations about, you know, different assaults or shootings. So he was not a nice person, but he doesn't deserve to die. You know, he was the one that really got the death sentence. You know, his family is never going to have any contact with him. This defendant, you know, can still have contact with his family, but he is, in fact, incarcerated where the rest of the public will be safe. All right. Go ahead. I'm going to be late with this, but tell me the difference between this case and a case that would warrant the maximum sentence. Perhaps if he chased him, you know, further down the sidewalk, the defendant's inside when he does the initial shot, which apparently hit, and then the victim tries to run away and he goes, you know, some distance. The defendant went out on the porch, shot three more times after hitting him, and the guy is running away. If he had continued down the street, still pursuing him, you know, maybe if he'd shot him more than, you know, the one shot. Those are the sort of circumstances. You know, had he had an actual prior conviction for a shooting incident, had he had a prior firearms, those would have, I think, you know, boosted it up to a maximum situation. So all of that would be worth five years. Is that your position? Those are the type of things. I hadn't really considered, so I'm thinking off the top of my head what could max him out. But I think you don't really have to look at, you know, what could have been worse. What the trial judge here has are the facts before him, and this is a very, very bad situation. Right, but don't we always look at them in a spectrum of conduct? You do. And so that's why I was asking you, what separates this from the maximum? And I noticed you came up with a lot of things, and you would think that it would be very little. No, because if you look at page 27 of my brief, these are the facts that the judge had to boost it up to the 55. And, you know, it does take into consideration the defendant's youth, the fact that at 15 he has this history, this extensive history. That doesn't bode well for his rehabilitation. And his rehabilitation and the, you know, usefulness of him in society in the future does have to be balanced against the protection of the public and the justice in this case. One of the factors that the trial judge also cites is deterrence. He refers to this as the wild, wild west. Everybody has guns. Everybody's shooting everybody all the time. If you want to have a deterrent effect, you know, you do have to show these young gang members, you know, if you go out and shoot someone, you're going to get in trouble. And that is part of the problem, and, you know, it's also part of the reason why, you know, as a public policy, they have added, they have the 25-year add-on for the firearm. In this case, it does take into effect the circumstance of the case because it requires that, or the jury finding was the defendant personally discharged the firearm. Again, you're going into the culpability. That was never disputed. Right. But that does, it shows the public policy reason, and certainly that this is, you know, a public policy statement for the add-ons. You know, everybody has guns everywhere all the time, and they're going off. So. Thank you very much. Thank you. All right, Mr. Hildebrand? Well, whether or not Mr. Holland had a gun was completely irrelevant. I mean, unless the defendant saw him with a gun, but that was completely irrelevant. And really that dovetails into probably the most important substantive piece of evidence supporting or corroborating the statement is why didn't Holland testify? If he had not seen a gun, what did he have to lose? Nothing. He had no civil or criminal liability at stake if he didn't see a gun. There was no reason for him not to testify unless he saw the gun, unless he took the gun. That is the strongest corroboration for this statement that there is in the record. The fact that he took the gun. Yes. Unless his word for it, his attorney's word for it. His attorney, he had an attorney there, and his attorney said if he testifies, he's going to subject himself to criminal responsibility. What criminal responsibility? The only reasonable thing that I can see is that he saw the gun and he took the gun. Don't we have to speculate, though, to get there? I don't see any other reasonable explanation for it. None. Whether he had a gun or not is irrelevant. He's not a co-defendant. He's not suspected of shooting Fryer. The defendant admitted shooting Fryer. So I don't see any alternative. And remember, you know, defense counsel never tried to get this in. There was no hearing. He just folded. What hearing would you expect him to put up? Well, if he said, well, this should come in under this exception, but he never did that. He just said, oh, geez, it's hearsay. Well, if he's claiming the fifth, then I can't do anything about it because that's hearsay. And the judge even said, yeah, this doesn't come under hearsay unless there's an exception to the hearsay rule. And that was like an opening for defense counsel to go, well, yeah, there is. But he didn't. He just folded. In your opening argument, we went through the factors, and basically you fell back on the position that, well, because it's so overriding and necessary for justice, that you really kind of failed on the individual factors. It wasn't spontaneous. They weren't, quote, close acquaintances. Escapes me now the other two factors. But no cross-examination opportunity. Right. Well, if counsel had tried to have this admitted under this, perhaps then he would have had a hearing and brought all this extra information that the court is suggesting that it needs to rule in his favor. But I believe that the record, just as it is right now, substantially corroborates it. It puts him there at each specific moment in time, which is important. And he exercises his fifth amendment right to testify when he's not even a suspect. And there's nothing there that would even suggest that he doesn't need it. I don't think there's any requirement that you have to have proof perfect that he made this statement. It's just, is it corroborated? Is it clearly corroborated? And it really is in this case. And it would be a mechanical application just to say, well, no, not enough, especially because it's so crucial to his defense. And he does have corroboration. And the guy does exercise his fifth amendment right. And I think it's important, you know, if this had happened three or four months earlier, he would have been 14 years old. So we are talking about a boy here. And I think that the state's comment about it being aggregate, I think that Miller, the U.S. Supreme Court case in Miller, I think that one of the defendants in that case had an aggregate sentence. And the aggregate sentencing wasn't part of their analysis in any way. So I don't think that is correct. And as far as the court exercising its discretion in the sentencing, I think that the sentence itself reflects that he didn't exercise his discretion as required by any of these cases. So you're saying when someone is a youth, the fact that they get a sentence near the maximum automatically means the judge didn't exercise his or her discretion? Not in this case. Not when he gets 80 years. No, absolutely not. So you're saying the very length of the sentence. The very length of the sentence indicates the exact opposite. And it sounds like he used his youth against the defendant. Can't have a bunch of kids running around the neighborhood with guns. Well, a deterrence to a normal person, if the defendant had gotten 20 years, the absolute minimum, even if the gun enhancement wasn't there, under the old sentencing guidelines, 20 years. To a normal person, that is a deterrence, spending 20 years in prison for the rest of your life, for running around the street with a gun. So the 80-year sentence certainly does not reflect what the state is saying that it does reflect. Thank you. Thank you very much, counsel. The court will take this matter under advisement and render a decision in due course. We'll stand in brief recess until the next case. Thank you very much.